**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GERSEN GABRIEL** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **DSM BIOMEDICAL, INC.** | : | **NO. 24-4546** |

**MEMORANDUM**

Savage, J.                                                                        August 6, 2025

Gersen Gabriel, an African American, brought this employment discrimination action against his former employer, DSM Biomedical, Inc. ("DSM"). He claims DSM discriminated against him and subjected him to a hostile work environment based on his race, leading to his constructive termination. He alleges that DSM repeatedly audited and designated the manufacturing site under his management as an "issue site" as pretense to subject him to disciplinary action. He also claims DSM retaliated against him for filing an EEOC charge accusing DSM of racial discrimination when it placed him on paid suspension.

Moving for summary judgment, DSM argues that Gabriel did not suffer an adverse action because his employment was unaffected by the audits and the issue site designation. It contends that Gabriel has not produced facts demonstrating intentional discrimination, and that the increased scrutiny at his worksite was justified by ongoing safety concerns. It adds that he was suspended in response to his erratic and threatening behavior.

We conclude that Gabriel cannot establish a *prima facie* case of discrimination because there is no evidence that he suffered intentional discrimination or an adverse

employment action.  His retaliation claim fails because, like his discrimination claim, he did not suffer an adverse employment action.

## Background

DSM, a nutrition, health, and beauty product manufacturer, operates 150 sites around the world.[1]   In 2020, DSM hired Gersen Gabriel as Senior Director of Global Biomedical Operations.[2]  Gabriel was responsible for managing Site X and reported to John Witkowski, President of Biomedical Operations.[3]

DSM maintained a Safety, Health, and Environment (SHE) "Issue Site" list, which identified the ten sites most in need of safety improvements.[4]   Issue Sites were periodically monitored for progress in preventing workplace injuries.[5]   Issue Site designations were made after an analysis of "quantitative and qualitative" criteria, including: the total recordable injury rate compared to other sites; the number of recordable injuries; the seriousness of the incidents; and the safety, health, and environmental culture at the site.[6]

The SHE Department, led by Jeroen In de Braak, proposed which sites to add or remove from the Issue Site list.[7]  Philip Eykerman, President of the Health, Nutrition and

---

[1] Def.'s Stmt of Material Undisputed Facts in Supp. of Mot. for Summ. J. ¶ 19, ECF No. 70-1 ["Def.'s SMF"].

[2] *Id.* ¶ 9; Pl.'s Resp. to Stmt of Facts; Pl.'s Counterstatement of Facts ¶ 9, ECF No. 89 ["Pl.'s SMF"].

[3] Def.'s SMF ¶¶ 9–11; Pl.'s SMF ¶¶ 9–11.  We use a pseudonym to refer to Site X pursuant to the parties' Stipulated Confidentiality Agreement.  *See* Order, Feb. 5, 2025, ECF No. 28 (granting the parties' Joint Motion for Entry of Stipulated Confidentiality Agreement); Order, May 7, 2025, ECF No. 86 (granting DSM's motion to maintain the confidentiality of Site X's location).

[4] Def.'s SMF ¶ 19; Pl.'s SMF ¶ 19. Dep. of Philip Eykerman 14:8–12 (attached as Ex. 12 to Def.'s SMF), ECF No. 79 ["Eykerman Dep."].

[5] Def.'s SMF ¶ 19; Pl.'s SMF ¶ 19.

[6] Def.'s SMF ¶ 22; Pl.'s SMF ¶ 22.

[7] Def.'s SMF ¶ 21; Pl.'s SMF ¶ 21; Eykerman Dep. 16:14–23, 18:10–16.

Care Business, had the authority to accept or reject the recommendations.[8]  Eykerman testified that he has never disagreed with the SHE Department's Issue Site recommendations.[9]

Site X was already on the Issue Site list when Gabriel was hired in 2020.[10]  Site X had two recordable injuries in 2020, 2022, and 2023, and one in 2021.[11]  DSM audited Site X in 2021 and 2022.[12]  Citing the recordable injuries, DSM kept Site X on the Issue Site list in 2021, 2022, 2023, and 2024.[13]

In June 2022, Gabriel and In de Braak met for the first time in person.  Gabriel testified that the interaction was "awkward," and In de Braak had "looked at [him] weird" when he learned that Gabriel was the Director of Biomedical Operations.[14]  Gabriel felt that In de Braak was "surprised" that Gabriel was the supervisor instead of his white subordinate.[15]

---

[8] Eykerman Dep. 10:19–14:7.

[9] *Id.* at 13:4–14:7.

[10] Def.'s SMF ¶ 25; Pl.'s SMF ¶ 25.

[11] Feb. 2, 2021, Memo (attached as Ex. 14 to Def.'s SMF), ECF No. 76-6; Feb. 1, 2022, Memo (attached as Ex. 15 to Def.'s SMF), ECF No. 76-7; Feb. 6, 2023, Memo (attached as Ex. 16 to Def.'s SMF), ECF No. 76-8; May 2, 2024, Memo (attached as Ex. 17 to Def.'s SMF), ECF No. 76-9.

[12] Def.'s SMF ¶¶ 42–43; Pl.'s SMF ¶¶ 42–43.  DSM conducts two types of manufacturing site audits: Corporate Operational Audits (COAs) and Peer-to-Peer Audits (P2P audits).  COA audits result in formal reports.  They are not limited to SHE issues and assess all business functions.  COA audits are typically conducted every three years.  Def.'s SMF ¶¶ 39–40; Pl.'s SMF ¶¶ 39–40.

P2P audits are limited to SHE issues.  They are less formal than COA audits and do not result in an official report.  P2P audits are typically conducted every 12–18 months.  Def.'s SMF ¶ 41; Pl.'s SMF ¶ 41.

[13] Def.'s SMF ¶¶ 26–29; Pl.'s SMF ¶¶ 26–29.

[14] Dep. of Gersen Gabriel 46:16–49:22 (attached as Ex. 4 to Def.'s SMF), ECF No. 78 ["Gabriel Dep."].

[15] Gabriel Dep. 364:7–22.

In January 2023, Gabriel reported two injuries at Site X.[16]  In response, In de Braak expressed concern about continuing safety issues at Site X.[17]  DSM CEO Dimitri de Vreeze suggested an unannounced audit at Site X, which both Eykerman and In de Braak supported.[18]  The audit was conducted in June 2023.[19]  It found one high-risk and eleven medium-risk SHE issues.[20]

On January 25, 2024, Witkowski submitted an internal HR complaint based on reports of "unfair treatment" and "bias" against Gabriel and other African American employees by In de Braak and the SHE Department.[21]  As an example, Witkowski relayed Gabriel's concern that In de Braak was unfairly targeting Site X.[22]

DSM conducted an internal investigation into the allegations against In de Braak. The investigation found "examples of micro-aggressions or un-conscious bias comments" by In de Braak, but "no confirmation of blatant racial discrimination."[23]  The investigators recommended, among other things, mandatory unconscious bias retraining for In de Braak and the audit team, and the removal of Site X from the Issue Site list.[24]

On March 6, 2024, Witkowski resigned and accepted a new position at Solesis.[25] A week later, Eykerman met with Gabriel to discuss the results of the internal

---

[16] Jan. 20, 2023, Email from Gersen Gabriel (attached as Ex. 20 to Def.'s SMF), ECF No. 76-12.

[17] *Id.*

[18] *Id.*

[19] July 11, 2023, Unannounced Audit Rep. (attached as Ex. 23 to Def.'s SMF), ECF No. 76-15.

[20] *Id.* at 2.

[21] Jan. 25, 2024, Email from John Witkowski (attached as Ex. 28 to Def.'s SMF), ECF No. ["Witkowski Compl."]; *see also* Investigation File 2–3 (attached as Ex. 1 to Pl.'s SMF), ECF No. 90.

[22] Investigation File 2.

[23] Investigation Summary 4 (attached as Ex. 29 to Def.'s SMF), ECF No. 76-19.

[24] *Id.*

[25] Def.'s SMF ¶¶ 10, 57; Pl.'s SMF ¶¶ 10, 57.

investigation.[26]  He offered Gabriel a $400,000 retention bonus to stay at DSM for at least three years.[27]  Gabriel declined the offer.

By early April, 2024, Gabriel had decided that he "didn't want to be part of [DSM]."[28]  On April 4, he texted Witkowski, "Can't wait to join you!!"[29]  On April 29, he texted Witkowski, "Waiting for you to get me out!"[30]

On June 17, 2024, Gabriel received an offer to join Solesis as Chief Operating Officer.[31]  The next day, he filed an EEOC charge, alleging race discrimination and retaliation arising from the "hostile work environment, different standards of employment, increased scrutiny, and even workplace audits."[32]

On June 26, 2024, Gabriel attended a work dinner.[33]  According to attendees, Gabriel characterized the dinner as his "last supper" and "going away party."[34]  Attendees claimed Gabriel told people he was leaving the company and gave a farewell speech.[35]

---

[26] Gabriel Dep. 394:3–17.

[27] Def.'s SMF ¶ 58; Pl.'s SMF ¶ 58; Retention Bonus Offer (attached as Ex. 33 to Def.'s SMF), ECF No. 73-8.

[28] Def.'s SMF ¶ 66; Pl.'s SMF ¶ 66; Gabriel Dep. 406:11-13.

[29] Text Messages Between Gersen Gabriel and John Witkowski 1 (attached as Ex. 1 to Def.'s SMF), ECF No. 76.

[30] *Id.*

[31] Def.'s SMF ¶ 94; Pl.'s SMF ¶ 94; June 17, 2024, Email from John Witkowski (attached as Ex. 43A to Def.'s SMF).

[32] EEOC Charge (attached as Ex. 45 to Def.'s SMF).  Gabriel signed the charge on June 18, 2024. The charge was received and docketed on June 20, 2024.

[33] Def.'s SMF ¶ 68; Gabriel Dep. 410:20–23.

[34] Dep of Brian Broeders 13:18–21 (attached as Ex. 34 to Def.'s SMF), ECF No. 82 ["Broeders Dep."]; Gabriel Dep. 412:5–11.

[35] Broeders Dep. 13:18–14:2; Gabriel Dep. 411:9–413:12.

The next day, Gabriel had a disagreement with his colleague Brian Broeders over a client call.  Broeders complained to HR about Gabriel's behavior.[36]

Feeling "hurt" and "betrayed" by Broeders, Gabriel sent a link to a song in a group text with his colleagues, which included the lyrics: "If I had my way. . . I'd like to see you hang. . . There's a rat in mi kitchen what am I gonna do? . . . I'm gonna fix that rat that's what I'm gonna do."[37]  The next day, Gabriel sent a link to a video in the group text that stated: "When I find out that you've been scheming against me and the people that I love, Well if it's a war you want! It's a war you gon have!"[38]

Later that day, DSM suspended Gabriel with pay pending an investigation into whether his behavior violated DSM's Code of Business Ethics.[39]  That same day, Gabriel accepted Solesis's employment offer.[40]

## Analysis

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Where

---

[36] Broeders Dep. 10:20–14:2. Broeders claims Gabriel tried to back out of a critical client call shortly before the call (though Gabriel ultimately decided to conduct the call) and told Broeders he did not plan to be in the office anymore.  *Id.* at 11:5–8, 14:7–21, 17:15–18:2, 19:23–21:19.  Gabriel disputes that he told Broeders he would not be in the office anymore, and disputes Broeders's characterization of the client call.  *See* Aff. of Gersen Gabriel (attached as Ex. 8 to Pl.'s SMF), ECF No. 87-2.

[37] Def.'s SMF ¶ 80; Pl.'s SMF ¶ 80; Gabriel Dep. 428:8–429:16, 461:11–463:21; Def.'s Mot. for Summ. J. 2, ECF No. 70 ["Def.'s Br."].

[38] Def.'s SMF ¶ 85; Pl.'s SMF ¶ 85; Ex. 41.

[39] Suspension Letter (attached as Ex. 42 to Def.'s SMF), ECF No. 73-15.

[40] June 30, 2024, Email from Gersen Gabriel (attached as Ex. 43A to Def.'s SMF), ECF No. 76-25; Employment Agreement (attached as Ex. 43 to Def.'s SMF), ECF No. 76-24.

the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Gillispie v. RegionalCare Hosp. Partners Inc.,* 892 F.3d 585, 592 (3d Cir. 2018).

In examining a motion for summary judgment, we must view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in his favor. *Peroza-Benitez v. Smith,* 994 F.3d 157, 164 (3d Cir. 2021) (citing *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015)). Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Revock v. Cowpet Bay W. Condo. Ass'n,* 853 F.3d 96, 112 (3d Cir. 2017) (citing *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 659 (3d Cir. 1993)). Credibility determinations, the drawing of legitimate inferences from facts, and the weighing of evidence are matters left to the jury. *In re Asbestos Prod. Liab. Litig. (No. VI),* 822 F.3d 125, 135–36 (3d Cir. 2016) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)). Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment. *Jutrowski v. Twp. of Riverdale,* 904 F.3d 280, 289 (3d Cir. 2018) (quoting *D.E. v. Central Dauphin School Dist.,* 765 F.3d 260, 268–69 (3d Cir. 2014)).

*Discrimination*

Because Gabriel is proceeding under a pretext theory, his claims are governed by the burden-shifting *McDonnell Douglas* analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Qin v. Vertex, Inc.,* 100 F.4th 458, 472–73 (3d Cir. 2024). Under the burden-shifting *McDonnell Douglas* framework, Gabriel must first establish a *prima facie* case of discrimination. *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 788 (3d Cir. 2016). Establishing a *prima facie* case of discrimination "'is not onerous' and poses 'a

7

burden easily met.'" *Doe v. C.A.R.S. Prot. Plus, Inc.,* 527 F.3d 358, 365 (3d Cir. 2008) (quoting *Tex. Dep't of Corr. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

If the plaintiff fails to establish a *prima facie* case, the defendant is entitled to judgment as a matter of law.  The determination of whether a *prima facie* case has been established is generally a question of law for the court.  *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (citing *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797–98 (3d Cir. 2003) (per curiam)).

If he succeeds in establishing a *prima facie* case, the burden shifts to the defendant "to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993)).  If the defendant satisfies its burden, the plaintiff must produce evidence from which a reasonable factfinder could conclude that the proffered reason for taking the adverse action was merely a pretext for intentional discrimination. *Id.* The final burden of production "merges with the ultimate burden of persuading [the jury] that [plaintiff] has been the victim of intentional discrimination."  *Burdine*, 450 U.S. at 256.

To make out a *prima facie* case of race discrimination, Gabriel must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.  *Qin*, 100 F.4th at 473.

DSM does not dispute, nor could it, that Gabriel, an African American, is a member of a protected class and that he was qualified for his position.  It disputes that he suffered

an adverse employment action and that there are circumstances creating an inference of intentional racial discrimination.

Intentional Discrimination

DSM argues that Gabriel's subjective feeling about a single "awkward" interaction with In de Braak is not sufficient to raise an inference of discrimination.[41]  DSM maintains that there is no evidence the audits or Issue Site designations of Site X were racially motivated.[42]

We agree that Gabriel's subjective feelings are not, on their own, sufficient to raise an inference of discrimination.  "Suspicion or subjective belief is insufficient to prove a claim of discrimination. There must be circumstances from which a reasonable juror could infer discrimination."  *Kocher v. McDonough*, No. CV 21-921, 2022 WL 17858056, at *6 (E.D. Pa. Dec. 22, 2022), *aff'd* 2023 WL 8469762 (3d Cir. Dec. 7, 2023); *see also Paradoa v. Philadelphia Hous. Auth.,* Civ. No. 13-6012, 2014 WL 2476595, at *4 (E.D. Pa. June 2, 2014), *aff'd,* 610 F. App'x 163 (3d Cir. 2015) *(citing Wilson v. Blockbuster, Inc.,* 571 F. Supp. 2d 641, 647 (E.D. Pa. 2008)).  Thus, Gabriel must produce evidence from which a jury could find that In de Braak was racially biased and unfairly targeting Gabriel by designating Site X as an Issue Site.

A plaintiff can raise an inference of discrimination by showing that similarly situated employees outside his protected class were treated more favorably.  *Qin v. Vertex, Inc.*, 100 F.4th at 474.

---

[41] Def.'s Br. 7–8.

[42] *Id.* at 8–9.

Gabriel argues that there were at least twenty DSM sites with a higher "total recordable injury" (TRI) rate than Site X in 2023.[43]  Eykerman testified that TRI is the "prime criteria" for determining which sites are added to the Issue Site list.[44]  Gabriel contends that the leaders of these sites are not Black and were treated more favorably than him because their sites were not added to the Issue Site list.[45]  But, he has not demonstrated that these site leaders are not members of his protected class.  The only evidence he cites for his claim that they are not Black is his deposition and Eykerman's deposition.  In his deposition, Gabriel merely asks a rhetorical question: "how many other African American Leaders do we have . . . ?"[46]  He does not provide an answer.  Eykerman could only identify one other Black site leader off the top of his head, but testified that "there are definitely other sites that have . . . black leaders."[47]

This evidence does not establish how many DSM site leaders are African American.  Nor does it show that the sites Gabriel argues were treated more favorably than Site X were led by non-Black site leaders. There is no evidence showing that non-Black employees similarly situated with Gabriel were treated more favorably than him. Therefore, Gabriel cannot raise an inference of discrimination using comparator evidence.

Gabriel also argues that evidence of racial discrimination by In de Braak toward other employees is sufficient to demonstrate intentional discrimination.[48]

---

[43] Pl.'s Resp. to Mot. for Summ. J. 15, 17, ECF No. 87 ["Pl.'s Opp'n"]; SHE Spreadsheet (attached as Ex. 3 to Pl.'s SMF), ECF No. 90-2.

[44] Eykerman Dep. 22:17–22.

[45] Pl.'s Opp'n 15.

[46] Gabriel Dep. 45:24–46:1.

[47] Eykerman Dep. 34:5–19.

[48] Pl.'s Opp'n 13–14.

John Witkowski reported that Gabriel and other African American employees have experienced "unfair treatment" by In de Braak.[49]   DSM responded by conducting an investigation.  Witkowski told investigators that In de Braak was treating Gabriel and Site X differently than others, citing the audits, Site X's placement on the Issue Site list, In de Braak's "unhelpful" and "finger pointing" tone with respect to Site X, and the incident in which Gabriel thought In de Braak mistook a white subordinate to be the Site X leader.[50] Witkowski felt DSM had "a racial bias using safety as a weapon to remove African American people."[51]  But, he did not identify any evidence or examples.

Witkowski told investigators that Jennifer McNight, an African American employee, once referred to In de Braak as "the racist."[52]   McNight described In de Braak as "argumentative," "loud," and "rude."[53]   When asked if she felt she had been treated differently because of her race, she declined to answer the question.[54]

The investigators also spoke to Shanta Myricks, an African American employee. She described an incident in which In de Braak told her "[i]f you are going to attack anyone, then attack me."[55]   Myricks felt the comment was inappropriate coming from a senior leader, was racially charged, and that In de Braak was targeting her for being "a black woman speaking out."[56]

---

[49] Witkowski Compl.

[50] Investigation File 2.

[51] *Id.* at 3.

[52] *Id.* at 2.

[53] *Id.* at 34.

[54] *Id.* at 35.

[55] *Id.* at 8.

[56] *Id.*

The investigators found "some examples of micro-aggressions or unconscious bias comments."  They found no "blatant racial discrimination" by In de Braak.

Eykerman testified that he recommended In de Braak be removed as SHE Department leader because he exhibited "bullying behavior" and did not have the "sensitivity and care" that the position required.[57]  But, he did not feel In de Braak had engaged in "racist" behavior.[58]  Dave Ellis described In de Braak as a "pusher" who needed to adjust his style.[59]  He explained that In de Braak "treats all sites the same" and "is tough with everyone."[60]

The evidence shows that Black and non-Black DSM employees considered In de Braak to be rude and abrasive.  There is evidence that In de Braak treated Gabriel in an unprofessional and hostile manner.  But, it does not show that he singled Gabriel out because he was African American.  There is no evidence giving rise to an inference of intentional racial discrimination by In de Braak or anyone else at DSM.  Therefore, Gabriel cannot establish a *prima facie* case of discrimination.

Adverse Employment Action

Even if there was evidence of intentional discrimination, Gabriel's *prima facie* case would fail because he did not suffer an adverse employment action.

Recently, the Supreme Court lowered the bar for establishing an adverse employment action.  Previously, the Third Circuit had defined an "adverse employment action" as one "that is serious and tangible enough to alter an employee's compensation,

---

[57] Eykerman Dep. 28:12–17, 30:5–31:23.

[58] *Id.* at 31:14–19.

[59] Investigation File 25.

[60] *Id.*

terms, conditions, or privileges of employment." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)).

In *Muldrow v. City of St. Louis,* the Supreme Court held that an employee need not demonstrate that an employment-related harm was significant, serious, substantial, "or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." 601 U.S. 346, 355 (2024). The Court explained that to discriminate under Title VII means to treat one employee "worse" than another based on a protected characteristic. *Id.* Therefore, an employee need only show "some" harm to establish an adverse employment action. *Id.* at 346–47, 354–55; *Peifer v. Board of Probation and Parole*, 106 F.4th 270, 277 (3d Cir. 2024).

Although *Muldrow* lowered an employee's burden of proof with respect to adverse employment actions, the employee must still demonstrate an "injury respecting [his] employment terms or conditions" to establish an adverse employment action. *Muldrow*, 601 U.S. at 348, 359; *see also Peifer*, 106 F.4th at 277.

Gabriel alleges he suffered four adverse employment actions: the serial designation of Site X as a SHE Issue Site, the change in his reporting structure, a hostile work environment, and constructive termination.[61]  We address each in turn.

---

[61] In his brief, Gabriel argued that the change in his reporting structure was a consequence of the Issue Site designation rather than a standalone adverse employment action. *See* Pl.'s Opp'n 10. At oral argument, plaintiff's counsel argued that the change in Gabriel's reporting structure itself was an adverse employment action. Oral Arg. Tr. 9:13–23.

Gabriel argues that DSM's designating Site X as an Issue Site four years in a row adversely affected his employment because it increased the number of audits and SHE scrutiny at Site X.[62]

Site X was not the only site to spend several years on the Issue Site List.  Nor was Site X's designation confined to Gabriel's tenure as Site X leader.  Site X was on the list before Gabriel took charge and remained there after Gabriel's departure.[63]  The Schenectady site was on the list for 4–5 years.[64]  The Sisseln site was on the list in 2021, 2023, and 2024.[65]  Thus, it was not unusual for DSM to keep sites on the Issue Site list for several years in a row.

The investigators spoke with several employees at Site X who described feeling pressure, stress, and frustration as a result of the SHE oversight at Site X.[66]  The investigators recommended that SHE remove Site X from the Issue Site list and avoid "unnecessary large internal site visits or audits" to alleviate the pressure on Site X.[67]

Experiencing stress does not amount to an actionable adverse employment action.  *See Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 168 (3d Cir. 2001); *Yarnall v. Philadelphia Sch. Dist.*, 57 F. Supp. 3d 410, 425 (E.D. Pa. 2014).  Gabriel must establish that the SHE scrutiny caused some harm with respect to the terms and conditions of his employment.

---

[62] Pl.'s Opp'n 10.

[63] Def.'s SMF ¶ 25, Pl.'s SMF ¶ 25; Oral Arg. Tr. 40:12–16.

[64] Investigation File 21; Feb. 2, 2021, Memo; Feb. 1, 2022, Memo; Feb. 3, 2023, Memo.

[65] Feb. 2, 2021, Memo; Feb. 6, 2023, Memo; May 2, 2024, Memo.

[66]Investigation Summary 3.

[67] *Id.*

Gabriel argues that the Issue Site designation was used as a basis to threaten his termination.[68]  He cites Dave Ellis's claim that In de Braak said "at some point if [Site X] doesn't come off the Issue Site list, you have to wonder if some consequence management at the leadership level would not be warranted."[69]  Witkowski and Gabriel interpreted "consequence management" to mean disciplinary action.[70]

There is no evidence that DSM had a policy of taking disciplinary action as a result of Issue Site designations.  Nor is there evidence that DSM ever initiated or planned to initiate disciplinary action against Gabriel as a result of the SHE issues at Site X.  Ellis denied that In de Braak's comment was directed to Gabriel personally.[71]  When asked what "consequence management" meant, Ellis stated there "is no prec[e]dent or procedure currently."[72]  Ellis felt they "had the right team doing the right things" at Site X, despite the ongoing safety issues there.[73]

DSM never demoted Gabriel, denied him a promotion, reduced his compensation, or placed him on a performance improvement plan.[74]  Even after the 2023 audit had found twelve SHE issues and Site X had spent four years on the Issue Site list under Gabriel's leadership, Gabriel received a merit-based pay increase and a $400,000 retention bonus offer to stay at DSM for at least three more years.[75]

---

[68] Pl.'s Opp'n 10.

[69] Investigation File 26.  In de Braak denied making this comment.  Dep. of Jeroen In de Braak 33:13–24 (attached as Ex. 13 to Def.'s SMF), ECF No. 80.

[70] Gabriel Dep. 23:21–24:20; Investigation File 2.

[71] Investigation File 27.

[72] *Id.* at 25.

[73] *Id.* at 26.

[74] Gabriel Dep. 406:14–24.

[75] Compensation Stmt (attached as Ex. 47 to Def.'s SMF), ECF No. 73-16; Def.'s SMF ¶ 58; Pl.'s SMF ¶ 58.

In short, there is no evidence that Site X's serial designation as a SHE Issue Site affected the terms and conditions of Gabriel's employment. Therefore, DSM's keeping Site X on the Issue Site list was not an adverse employment action.

Gabriel argues that DSM's changing his reporting structure constitutes an adverse employment action. He testified that in January 2023, Eykerman, In de Braak, and Ellis informed him that he would start reporting to Ellis instead of John Witkowski.[76]

Gabriel does not offer any evidence or explanation as to how the change adversely affected his employment. The reporting change did not affect his rank. It did not change his role or responsibilities. It did not impact the terms or conditions of his employment in any way. Therefore, the change in Gabriel's reporting structure was not an adverse employment action.

Having determined that the Issue Site designations and the change in Gabriel's reporting structure do not amount to adverse employment actions, we turn to Gabriel's claim that DSM created a hostile work environment and constructively terminated him.

If proven, a hostile work environment and constructive termination both constitute adverse employment actions. *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66–67 (1986)) (hostile work environment); *Green v. Brennan*, 578 U.S. 547, 555 (2016) (constructive termination); *Hill v. Borough of Kutztown*, 455 F.3d 225, 247, n.32 (3d Cir. 2006) (constructive termination).

---

[76] Gabriel Dep. 16:5–13, 66:23–67:12, 117:5–19, 369:6–370:4.

DSM argues that because Gabriel did not plead hostile work environment and constructive termination as separate counts, he cannot pursue these claims.[77] Throughout his complaint, Gabriel alleges that DSM's conduct created a hostile work environment and caused his constructive termination.

Gabriel was not required to plead each theory of recovery in separate counts. *See Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1247 (11th Cir. 2004) ("While it may well be preferable to plead different theories of recovery in separate counts, it is not required."); Fed. R. Civ. P. 8 (d)(1), (2) ("No technical form [of pleading] is required" and "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."). The complaint "need only contain allegations to give 'the defendant fair notice of what the. . . claim is and the grounds upon which it rests.'" *Carpenters Health v. Mgmt. Res. Sys. Inc.*, 837 F.3d 378, 384 (3d Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

DSM was on notice of Gabriel's claims of hostile work environment and constructive termination. The phrases "hostile work environment" and "constructive termination" appear several times in the complaint.[78] In the Rule 26(f) report, DSM addressed Gabriel's claims that he was constructively terminated and subjected to a hostile work environment.[79] Thus, DSM had notice of Gabriel's hostile work environment and constructive termination claims.

A hostile work environment requires conduct that is "severe or pervasive enough

---

[77] Def.'s Reply in Further Supp. of Its Mot. for Summ. J. 2–3, ECF No. 91.

[78] Compl. ¶¶ 26, 32–33, 38–39, 44–45, 50–51, ECF No. 1.

[79] Rep. of Rule 26(f) Meeting 3–4, ECF No. 13.

to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Wright v. Providence Care Ctr., LLC,* 822 F. App'x 85, 96 (3d Cir. 2020) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). In determining whether harassment is sufficiently severe or pervasive, we consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance." *Mandel*, 706 F.3d at 168 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)). Evidence of an isolated or single incident of harassment, unless extremely serious, does not establish a hostile work environment. *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)); *Chandler v. La-Z-Boy, Inc.,* 621 F. Supp. 3d 568, 573 (E.D. Pa. 2022).

To prove that a plaintiff suffered severe and pervasive discrimination, for purposes of a hostile work environment claim under Title VII, a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment. *Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist.,* 971 F.3d 416, 428 (3d Cir. 2020) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

Gabriel maintains that the discrimination was severe and pervasive.  He cites Eykerman's testimony that In de Braak engaged in bullying behavior, Ellis's claim that In de Braak threatened "consequence management" for leadership at Site X, the "barrage"

of audits, and the investigation's findings of microaggressions by In de Braak against Gabriel and Myricks.[80]

We have already determined that there is no evidence of intentional discrimination—let alone severe or pervasive discriminatory conduct. Sporadic instances of bullying or microaggressions by In de Braak do not rise to the level of a hostile work environment as a matter of law. *See e.g.*, *Robinson v. Am. Reading Co.*, Civ. No. 24-5608, 2025 WL 1243058, at *5 (E.D. Pa. Apr. 29, 2025); *McCloud v. United Parcel Serv., Inc.*, 543 F. Supp. 2d 391, 399 (E.D. Pa. 2008). Gabriel does not claim anyone, including In de Braak, made racial comments or slurs or otherwise harassed any employees because they were African American. There is no evidence of such comments and conduct.

Nor is there evidence In de Braak's conduct interfered with Gabriel's work performance. *Mandel*, 706 F.3d at 168. Indeed, even after he complained that In de Braak was unfairly targeting him, Gabriel received a merit pay increase and a $400,000 bonus offer to stay at DSM. Therefore, Gabriel cannot establish that he was subject to a hostile work environment.

To establish constructive termination, plaintiff must show "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Mandel*, 706 F.3d at 169 (quoting *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1084 (3d Cir.1996)). Working conditions that are stressful, frustrating, and uncomfortable are not sufficient. *Woods v. Salisbury Behav. Health, Inc.*, 3 F. Supp. 3d 238, 256 (M.D. Pa. 2014) (*citing Duffy*, 265 F.3d at 170).

---

[80] Pl.'s Opp'n 13.

Because the test is objective, an employee's subjective perceptions of unfairness or harshness cannot support a claim of constructive discharge.  *Mandel*, 706 F.3d at 169.

"To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment."  *Id.* at 170 (quoting *Spencer v. Wal–Mart Stores, Inc.,* 469 F.3d 311, 317 n.4 (3d Cir. 2006)).

Gabriel argues that he was constructively terminated because DSM intended his suspension to lead to his termination.  He cites Eykerman's testimony that regardless of the results of the investigation, he had already determined that he would not permit Gabriel to return to work.[81]

That Eykerman intended to terminate Gabriel's employment following the internal investigation has no bearing on whether the conditions of Gabriel's employment were intolerable.  There is no evidence Gabriel knew of Eykerman's intention to fire him. Gabriel resigned and accepted new employment before the investigation concluded and before DSM could make the suspension permanent.  Thus, Eykerman's testimony that he planned to fire Gabriel is not proof that he was constructively terminated.

Because we have already determined that Gabriel has not demonstrated sufficient severity or pervasiveness to establish a hostile work environment, his claim that he was constructively terminated necessarily fails.  The conditions of Gabriel's employment were not so intolerable that they would compel a reasonable person to resign.  Gabriel cannot demonstrate that DSM constructively terminated him.

---

[81] Eykerman Dep. 47:4–48:9.

There is no evidence that the suspension was related to the alleged discrimination. Gabriel's discrimination claim is based on In de Braak's alleged racial bias and increased scrutiny of Site X. There is no evidence that In de Braak was involved in Gabriel's suspension. Nor is there evidence that the suspension had anything to do with the SHE issues at Site X. Indeed, these were independent actions taken by different persons. Because there is no evidence suggesting a causal link between the suspension and the alleged discriminatory conduct, Gabriel cannot rely on the suspension as an adverse employment action.

Having determined that Gabriel did not suffer an adverse employment action, we conclude that he has failed to establish a *prima facie* case of discrimination. Therefore, DSM is entitled to summary judgment on Gabriel's discrimination claims under Title VII and the PHRA.

*Retaliation*

The *McDonnell Douglas* burden-shifting framework applies in retaliation cases. *Canada v. Samuel Grossi & Sons, Inc.,* 49 F.4th 340, 346 (3d Cir. 2022). The plaintiff must first establish a *prima facie* case of retaliation. *Id.*

To establish a *prima facie* case of retaliation under Title VII, Gabriel must demonstrate that: (1) he engaged in a protected activity; (2) his employer took adverse employment action against him after or contemporaneously with his protected activity; and (3) there was a causal connection between his protected activity and the adverse employment action. *Id.* (quoting *Daniels v. School Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015)).

*Muldrow* did not affect the standard for adverse employment actions in the retaliation context.  601 U.S. at 348.  A plaintiff alleging retaliation must still demonstrate the alleged retaliatory employment action is "'materially adverse,' meaning that it causes 'significant harm.'"  *Id.* (quoting *Burlington N. & S. F. R. Co. v. White*, 548 U.S. 53, 68 (2006).  A retaliatory action is materially adverse if it would "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  *White*, 548 U.S. at 68 (citations omitted).

Gabriel claims that DSM suspended him with pay in retaliation for submitting an EEOC charge accusing DSM of discrimination.[82]  Generally, a paid suspension pending an investigation into suspected wrongdoing is not, by itself, an adverse employment action.  *See Davis v. Legal Servs. Alabama, Inc.*, 19 F.4th 1261, 1266–67 (11th Cir. 2021); *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 889, 891–892 (8th Cir. 2005).  Only if there are collateral consequences adversely affecting the plaintiff's employment conditions does the suspension amount to an adverse employment action.

The suspension did not lead to Gabriel's termination.  There were no consequences from the suspension.

The suspension was instigated after Gabriel had planned to leave DSM to join his friend Witkowski at Solesis.  His departure was not linked to his filing an EEOC complaint.  It is undisputed that shortly after he declined the retention bonus in March 2024, Gabriel

---

[82] Gabriel's complaint alleges that DSM retaliated against him for both the internal complaint and his EEOC charge.  Compl. ¶¶ 36, 48.  At oral argument, plaintiff's counsel only cited the EEOC complaint as the basis for the retaliation claim.  Oral Arg. Tr. 56:17–20.  His brief only addresses the EEOC charge as a basis for retaliation.  Pl.'s Opp'n 20–22.  An issue is waived if a party fails to adequately brief it.  *Skold v. Galderma Lab'ys, L.P.,* 99 F. Supp. 3d 585, 598 (E.D. Pa. 2015); *see also* Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in his own pleading . . . .").  Thus, Gabriel has waived his claim that DSM retaliated against him for the internal discrimination complaint.

planned to join Witkowski.[83]  At his deposition, Gabriel was asked: "When you refused to accept the bonus, you already decided that you were leaving the company; true?"[84] Gabriel responded: "I made up my mind somewhere about a month later that I didn't want to be part of that company, somewhere in April."[85]  On April 4, 2024, after Witkowski had started working at Solesis, Gabriel texted him, "Can't wait to join you!!"  This comment suggests his joining Witkowski had been in the works.  On April 29, 2024, Gabriel texted Witkowski, "Waiting for you to get me out!!"  On June 17, 2024—one day before he filed his EEOC charge—Gabriel received the offer of employment at Solesis that he sought.

The undisputed evidence shows that Gabriel had already decided he would be leaving DSM and had a new job offer before he filed his EEOC charge on June 18, 2024, and before he was suspended on June 30, 2024.  Gabriel resigned before the investigation concluded.  At the time of his resignation, DSM had taken no adverse employment action against Gabriel.  Because Gabriel did not suffer an adverse employment action, he cannot establish a *prima facie* claim of retaliation.

## Conclusion

We conclude that Gabriel cannot meet his *prima facie* burden of demonstrating intentional discrimination or an adverse employment action.  Therefore, DSM is entitled to summary judgment.

---

[83] Def.'s SMF ¶ 66; Pl.'s SMF ¶ 66; Gabriel Dep. 180:20–24, 406:8–13.

[84] Gabriel Dep. 406:8–10.

[85] Gabriel Dep. 406:11–13.